**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **PATRICIA WILLIAMSON,** | : | **No. 3:04cv1142** |
| **Plaintiff** | : | |
| | : | **(Judge Munley)** |
| **v.** | : | |
| | : | |
| **PENN MILLERS INSURANCE** | : | |
| **COMPANY, JACK L. BURKE, and** | : | |
| **HARVEY SPROUL,** | : | |
| **Defendants** | : | |

:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

**MEMORANDUM**

Presently before the Court for disposition is the defendants' Joint Motion for

Summary Judgment on Plaintiff Patricia Williamson's employment discrimination claims.

This matter has been fully briefed and is ripe for disposition. For the following reasons, we

will grant the Motion and dismiss this case.

**I.      Background**

On August 9, 1993, when Williamson was 46 years old, Defendant Penn Millers

Insurance Company hired her to be the Executive Secretary to the President and Chief

Executive Officer, Defendant Jack L. Burke. She held this position until she was terminated

on February 25, 2003. Williamson was the only Executive Secretary at Penn Millers.

On May 15, 2000, Williamson asked Burke how she could move into a position to

earn more money. (Pl. Dep. 35). Burke advised her to meet with Pat Staples, then the

Human Resources Director. (Pl. Dep. 36). Williamson met with Staples, and Staples

explained that other Executive Secretaries in the region made less, and Williamson felt

insulted.  (Pl. Dep. 36, 105-06).  Staples informed Williamson that they would meet again the

next Monday, and Williamson should keep track of her time and activities.  (Pl. Dep. 36).

Williamson complied, but after the next meeting Staples did not pursue the matter further.

(Pl. Dep. 36-37).  Williamson felt that she should not have to pursue the matter with Staples,

and Burke should have handled the situation.  (Pl. Dep. 35-36).

Each position at Penn Miller corresponds to a salary grade.  (Pl. Dep. 33; Pl. Dep. Ex.

5).  As an Executive Secretary, Williamson was pay grade seven, with a minimum salary of $

19,252 and a maximum of $ 32,779.  (Staples Aff. Ex. A).  By 2001, Williamson earned

twenty six percent over the maximum for her grade. (Pl. Dep. 67-69).  Williamson, however,

wanted a title that would change her classification to place her in a higher grade.  (Pl. Dep.

68-69).  Specifically, she wanted to be an officer.  (Pl. Dep. 70) Williamson, however, did

not ask for a title, (Pl. Dep. 69) nor did she apply for another position in the company (Pl.

Dep. 76.).  Williamson felt as though she was unqualified to perform any existing officer

position, but thought she was qualified to become Assistant Secretary of the Corporation.

(Pl. Dep. 74)  Prior to Williamson's arrival, however, the company discontinued this position,

and she did not want them to reimplement the position.  (Pl. Dep. 75)  Penn Millers offered

training courses and tuition reimbursement for courses that could lead to opportunities within

the company, but she did not avail herself of these opportunities.  (Pl. Aff. ¶¶ 39-46).

After Williamson approached Burke about opportunities for advancement in May of

2000, she felt as though her relationship with him changed significantly.  (Pl. Aff. ¶ 57).  She

2

lists a number of subsequent incidents that she characterized as "harassment." (Pl. Aff. ¶¶ 61-62). She explained that the "harassment" consisted of a few occasions where Burke would call her into his office to "drop a bomb" on her. (Pl. Dep. 119). Specifically, she testified, "I did not believe he was harassing me. What I meant by harassment is just to call me in. Periodically, he'd drop a bomb on me." (Pl. Dep. 119). She explained that this "harassment" related to a number of incidents she deemed insignificant. (Pl. Aff. ¶ 61). First, Burke misinterpreted a comment Williamson made about liners used in remodeling the company kitchen. (Pl. Aff. ¶ 63a). Burke's wife supplied the liners, and when Burke asked Williamson how the liners worked out, she told him they did not and stated "somebody's head is going to roll." (Id.) Williamson did not mean Burke's wife's head was going to roll, but Burke called her into his office and said he took the comment personally, and Williamson apologized. (Id.) In the next incident, Burke overheard Williamson correct Scott Veech' grammar, and he advised her that he did not find it appropriate because Veech was a senior officer. (Pl. Aff. ¶ 63b). During one meeting, Williamson expressed that she felt something was amiss, and Burke told her "you will never advance in this company in your position. All you are is an Executive Secretary, you will never become an officer of the company." (Pl. Aff. ¶ 63e).

In another meeting, on April 17, 2001, Burke advised Williamson that she should reduce her visiting within the company. (Pl. Aff. ¶ 63b). Williamson explained to Burke that she felt she was following his previous order to make herself seen within the company, and

added that she rarely left her desk.  (Pl. Aff. ¶ 63d).  Williamson responded that she wanted

to bring the matter to the attention of Harvey Sproul and Harvey Rose, two directors of the

company, to explain her side of the story.  (Pl. Dep. 176-77).  Burke explained that the

directors do not become involved in personnel matters.  (Pl. Dep. 178).  A couple of hours

later, Burke told her that she could be cited for insubordination.  (Pl. Dep. 83-84).  A few

days later he again told her she could be cited for insubordination.  (Pl. Dep. 84).  On April

19, 2001, Williamson signed a memorandum that explained that personnel issues should not

go to the Executive Committee and she would suffer serious consequences if she did. (Pl.

Dep. 179-80).  On April 20, 2001, Williamson spoke with Mark DeCesaris, the Senior Vice

President, about what transpired with Burke.  (Pl. Aff. ¶ 63o).  DeCesaris sought her

assurance that she would not take her concerns to any member of the executive committee

and specifically that she would not talk to Sproul or Rose.  (Id.).  DeCesaris also warned her

that if she did, she could be cited for insubordination.  (Id.).  On April 24, 2001, Williamson

apologized to Burke, and assured him that at no time would she go over his head and call a

meeting with Rose and Sproul.  (Pl. Dep. 185).

Williamson and Burke continued to have personal issues with minor office incidents.

For example, in June of 2002, Burke confronted her about her phone use.  (Pl. Aff. ¶ 63s).

Burke also suspected that Williamson had obtained confidential information and written

anonymous letters to Rose and Sproul.  (Burke Aff. ¶¶ 14-20).

On Friday, February 21, 2003, their issues culminated in a meeting where Burke

called Williamson into his office and told her she would no longer attend directors meetings, board advisory meetings, manager meetings, or officer meetings. (Pl. Aff. ¶ 63y). He also told her that she would no longer open his mail and he wanted her key back. (Pl. Aff. ¶ 63y).

Williamson immediately called Sproul without discussing it with Burke. (Pl. Dep. 93). Sproul stated he was glad she called and was saddened to hear about her situation. (Pl. Aff. ¶ 68). She informed him that he needed to "step up to the plate" on behalf of the employees of the company, and if he did not do so she would write a letter to every director and would sue the company. (Pl. Dep. 96-98). Sproul also explained that he would have to inform Burke of the conversation. (Pl. Aff. ¶ 68).

The next day, Williamson called a former employee, Karen Martinelli, and said she felt that she soon would be terminated. (Pl. Aff. ¶ 72-75). Williamson took a personal day the Monday after her conversation with Sproul, but she received a phone call from Staples directing her not to report to work until Penn Millers decided how to respond to her conversation with Sproul. (Pl. Dep. 95-96). The following day, Staples called back to tell Williamson that she was terminated. (Pl. Dep. 95-96). Burke made the decision to fire Williamson in consultation with Staples. (Burke Aff. ¶ 28).

Williamson was 56 at the time of her termination and was earning $ 43,290 per year, approximately thirty-two percent above the maximum for her pay grade. (Staples Aff. ¶ 3). Following Williamson's termination, Kathy Lettieri assumed the newly created position of Assistant to the President. (Staples Aff. ¶ 5). Previously, Lettieri had been the Administrator

in the Public Relations Department.  (Staples Aff. ¶ 4).  In her new position, Lettieri

continued to perform her public relations duties, but also assumed Williamson's former

duties assisting Burke with the daily operations of the Executive Department.  (Staples Aff. ¶

5).  Assistant to the President is not an officer position, (Staples Aff. ¶ 7) and it is salary

grade four, with a minimum salary of $ 27,600 and a maximum salary of $ 44,200.  (Pl. Ex.

G).

    In recognition of her added responsibilities, Lettieri received a ten percent  raise

effective March 17, 2003, less than a month after Williamson was terminated.  (Staples Aff. ¶

6).  Following her raise, Lettieri earned $ 37,358.10.  (Id.)  In November 2003, Lettieri

earned an eight percent raise and her salary increased to $40,352.  (Pl. Ex. G).  Penn Millers

granted this raise because she successfully performed new duties.  (Id.).  In November 2004,

Lettieri earned a six percent increase in her salary, raising it to $ 42,773.12. (Pl. Ex. H).

## II.    Jurisdiction

    The Court exercises jurisdiction over this dispute pursuant to its federal question

jurisdiction, 28 U.S.C. § 1331, and supplemental jurisdiction, 28 U.S.C. § 1367.

Pennsylvania law applies to those claims considered pursuant to supplemental jurisdiction.

United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966) (citing Erie R.R. Co. v.

Tompkins, 304 U.S. 64 (1938)).

## III.    Standard

    Granting summary judgment is proper if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  See Knabe v. Boury, 114 F.3d 407, 410 n.4 (3d Cir. 1997) (citing FED. R. CIV. P. 56(c)).  "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original).

In considering a motion for summary judgment, the court must examine the facts in the light most favorable to the party opposing the motion.  International Raw Materials, Ltd. v. Stauffer Chemical Co., 898 F.2d 946, 949 (3d Cir. 1990).  The burden is on the moving party to demonstrate that the evidence is such that a reasonable jury could not return a verdict for the non-moving party.  Anderson, 477 U.S. at 248 (1986).  A fact is material when it might affect the outcome of the suit under the governing law.  Id.  Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial.  Celotex v. Catrett, 477 U.S. 317, 322 (1986).  Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond its pleadings, and designate specific facts by the use of affidavits, depositions, admissions, or answers to interrogatories showing that there is a genuine issue for trial.  Id. at 324.

7

**IV.     Discussion**

Williamson advances age discrimination claims pursuant to the Age Discrimination in

Employment Act, 29 U.S.C. §§ 621-34, and the Pennsylvania Human Rights Act ("PHRA"),

43 PA. STAT. §§ 951-63, and gender discrimination claims pursuant to Title VII of the Civil

Rights Act of 1964, 42 U.S.C. §§ 2000e-2000e-17, and the PHRA.  Williamson argues that

she can present circumstantial evidence of discrimination under the burden-shifting analysis

of  McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).[1]  Under McDonnell Douglas,

the plaintiff must first make a prima facie showing of discrimination.  Pivirotto v. Innovative

Systems, Inc.,191 F.3d 344, 352 n.4 (3d Cir. 1999).  A plaintiff can establish a prima facie

case by showing that: (1) he was a member of a protected class, i.e., that he was over 40; (2)

was qualified for the position; (3) suffered an adverse employment despite his qualifications;

and (4) under circumstances that raise an inference of discriminatory action, the employer

continued to seek out individuals with qualifications similar to the plaintiff's to fill the

position.  Sarullo v. United States Postal Service, 352 F.3d 789, 797 (3d Cir. 2003) (citations

omitted).  If the plaintiff cannot establish these elements, the defendant is entitled to

judgment as a matter of law.  Pivirotto 191 F.3d at 352 n.4.  If the plaintiff does establish a

prima facie case, the burden of production shifts to the defendant and requires that he

produce some evidence of a legitimate, nondiscriminatory reason for the adverse employment

---

[1] We will analyze each claim under the same legal framework.  Fogleman v. Mercy Hosp. Inc., 283 F.3d 561, 567 (3d Cir. 2002) (ADEA, Title VII, and PHRA claims are all analyzed under the McDonnell Douglas test).

action.  Id.  Once the defendant does so, the plaintiff must prove by a preponderance of the

evidence that the proffered nondiscriminatory reason was pretext and discriminatory animus

was the actual reason for the employment action.  Id.  The plaintiff can create a genuine issue

of material fact that the nondiscriminatory explanation is pretext "only if he submits evidence

from which a factfinder could reasonably either (1) disbelieve the employer's articulated

legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely

than not a motivating or determinative cause of the employer's action."  Connors v. Chrysler

Financial Corp., 160 F.3d 971, 974 n.2 (3d Cir. 1998).

### A.     Prima Facie Case

The first three prongs of the prima facie case are not in dispute.  Williamson was a

member of two protected classes because she was a woman over forty.  The defendants have

not disputed her qualifications, or that she was terminated.  The parties disagree about the

appropriate test for the fourth prong because various cases describe it differently.

The fourth prong is flexible, and thus courts do not employ the same test for every

factual situation.  "[O]ne prima facie standard cannot apply 'in every respect to differing

factual situations.'"  Matczak v. Frankford, 136 F.3d 933, 940 (3d Cir. 1997) (quoting

McDonnell Douglas, 411 U.S. at 802 n.13).  "'[T]he nature of the required showing' to

establish a prima facie case of disparate impact by indirect evidence 'depends on the

circumstances of the case.'"  Marzano v. Computer Science Corp. Inc., 91 F.3d 497, 503 (3d

Cir. 1996) (citations omitted).

9

Williamson argues that she need only show that Penn Millers had a continuing need for her services.  See, e.g., Olson v. General Electric, 101 F.3d 947, 951 (3d Cir. 1996) (describing fourth element as requiring plaintiff to establish "after his rejection, the position remained open and the employer continued to seek applicants.").  This standard is appropriate in a failure to hire or promote case, such as Olson, but not in the facts presently before the Court.  See Fuentes v. Perkins, 32 F.3d 759, 764 (3d Cir. 1994) ("In a case of failure to hire or promote under Title VII, the plaintiff first must carry the initial burden of establishing . . .(iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications") (emphasis added).

In a case of termination and replacement, courts employ a different test.  "In the context of a claim of discriminatory termination of employment, for instance, we have held that the plaintiff must 'prove by a preponderance of the evidence that . . . he ultimately was replaced by a person outside the protected class."  Marzano, 91 F.3d at 503 (citations omitted).

Even in a reduction in force case, where the terminated employee is not specifically replaced, it is insufficient for the plaintiff to merely demonstrate that the employer maintained a continuing need for individuals with similar qualifications.  Id.  Rather, the plaintiff must show the employer retained similarly qualified individuals outside the protected class.  Id.; see also Anderson v. Consolidated Rail Corp., 297 F.3d 242, 250 (3d

10

Cir. 2002) (finding that the plaintiff in an age discrimination reduction in force case must establish "that the employer retained someone similarly situated to him who was sufficiently younger.").

In <u>Narin v. Lower Merion School District</u>, the court dismissed an age discrimination claim because the plaintiff could not establish "the employer ultimately filled the position with someone sufficiently younger to permit an inference of age discrimination."  206 F.3d 323, 331 (3d Cir. 2000).[2]  The fifty-six year old plaintiff could not establish a prima facie case where her replacements were fifty-four and forty-nine, respectively, because "we cannot conclude that [the defendant] ultimately filled the . . .positions with <u>someone sufficiently younger to permit an inference of discrimination.</u>"  <u>Id.</u> at 333 n.9 (emphasis added).  Under Williamson's suggested continuing need test, the <u>Narin</u> court would have been compelled to find a prima facie case because the defendant clearly had a continuing need for the plaintiff's services because it replaced her.

However, as established in <u>Narin</u>, the continuing need test does not apply where the plaintiff has been terminated and replaced.  We will not, however, require Williamson to demonstrate she was ultimately replaced by someone outside of her class.  While the gender of her replacement is relevant, she is not precluded from establishing the fourth element because her replacement was a woman.  <u>See</u> <u>Pivirotto v. Innovative Systems, Inc.</u>, 191 F.3d 344, 354 (3d Cir. 1999) ("An employee may be able to show that his race or other

---

    [2] We recognize that Williamson asserts both age and sex discrimination, but the burden shifting analysis is the same for both. <u>Marzano</u>, 91 F.3d at 503 n.2.

11

characteristic that the law places off limits tipped the scales against him, without regard to the demographic characteristics of his replacement."). Therefore, we inquire whether Williamson has demonstrated that the circumstances of her termination and replacement raise an inference of discrimination. See Peltier v. United States, 388 F.3d 984, 987 (6th Cir. 2004) (finding that a gender discrimination plaintiff must establish "she was replaced by a person outside the protected class, or similarly situated non-protected employees were treated more favorably"); Lalvani v. Cook County, 269 F.3d 785, 789 (7th Cir. 2001) (requiring the plaintiff to demonstrate "the employer treated similarly situated persons not in the protected class more favorably" to establish the fourth element); Carson v. Bethlehem Steel Corp., 82 F.3d 157, 159 (7th Cir. 1996) (holding that a race discrimination plaintiff need not establish he was replaced by a member of a different race but the "question instead is whether the plaintiff has established a logical reason to believe that the decision rests on a legally forbidden ground"); Walker v. St. Anthony's Medical Center, 881 F.2d 554, 558 (8th Cir. 1989) (finding that a woman replaced by another woman can establish the fourth element by demonstrating that her "discharge occurred in 'circumstances which allow the court to infer unlawful discrimination.'").

We find that Williamson has satisfied the fourth element of her prima facie case of age discrimination. She was fifty-six at the time she was fired, and she was replaced by Lettieri, a woman in her thirties, thus raising an inference of age discrimination.

We do not, however, find that Williamson has produced sufficient evidence to raise an

inference of gender discrimination.  First, Williamson's replacement was a woman.  Second, she has produced no evidence that a similarly situated man would not have been treated differently.  In <u>Pivirotti</u>, the court gave examples of ways a woman could establish a prima facie case of sex discrimination even if she was replaced by a woman.  <u>Id.</u> at 353-54.  She could show she had "been treated differently from similarly situated male employees." <u>Id.</u> She could show the employer fired her for failing "to act in a particular manner (e.g., 'feminine,' assertively, non-assertively), but not require male employees to act in a particular way." <u>Id.</u> at 354.

Williamson has produced no such evidence, and her evidence in no way raises an inference that her termination was based on discrimination.  Williamson has established evidence that former employee Karen Martinelli earned less than a similarly situated male, Gary Gausam.  Then, when Grausam left the company, the company passed over two women to hire a man.  We find this evidence does not establish that the circumstances of Williamson's termination raise an inference of discrimination.  None of her evidence relates to a termination, the circumstances of her termination, or a similarly situated male. Additionally, Williamson has produced affidavits of former employees opining about the atmosphere at Penn Millers and Burke's involvement.  Grausam expressed his opinion that "This is a very male chauvinistic company."  (Grausam Aff. ¶ 45).  Martinelli opined that "Jack Burke, the Board of Directors and the Vice Presidents have set the tone for the discriminatory atmosphere and attitudes at Penn Millers."  (Martinelli Aff. ¶ 67).  These

unsupported opinions are irrelevant and do not create an inference of discrimination.  See

Jones. v. School District of Philadelphia, 198 F.3d 403, 414 (3d Cir. 1999) (finding

unsupported allegations of discrimination predicated on personal beliefs irrelevant).

Therefore, Williamson has not produced evidence she was replaced by a male, or that

a male would have been treated more favorably under the circumstances.  Rather, she relies

on a number of irrelevant incidents and unsupported opinions.  Therefore, we find

Williamson has not satisfied the fourth element of her prima facie case of sex discrimination

because she has not raised an inference that her termination was based on gender.

Accordingly, we will dismiss her gender discrimination claims.[3]

However, we will continue to analyze her age discrimination claims under the

remaining two steps of the McDonnell Douglas burden shifting test.

**B.      Legitimate Non-Discriminatory Reason**

In response to Williamson's prima facie case of age discrimination, the defendants

proffer her insubordination as the reason for her termination.  Specifically, they provide that

they fired Williamson because she called Sproul to discuss personnel matters when she was

specifically warned not to, and then threatened to sue the company if Sproul did not become

involved.

---

[3] Furthermore, even if this evidence did establish a prima facie case of gender discrimination, we find it is insufficient to create a genuine issue of material fact that the defendants' legitimate nondiscriminatory reasons for terminating her employment were pretext.

**C.     Pretext**

A plaintiff can create a genuine issue of material fact that the nondiscriminatory explanation is pretext "only if he submits evidence from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Connors v. Chrysler Financial Corp., 160 F.3d 971, 974 n.2 (3d Cir. 1998).

**i.     Disbelieve the Articulated Reason**

Under the first option, "a plaintiff can cast sufficient doubt on a defendant's legitimate non-discriminatory reason by showing 'weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action [such] that a reasonable fact finder could rationally find them unworthy of credence.'" Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1072 (3d Cir. 1996) (quoting Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143 (2000)).

Williamson argues that she was not insubordinate and therefore this reason is implausible.  In support, she provides the decision of the Unemployment Compensation Referee, who awarded her benefits.[4]  (Pl. Ex. N.)  She argues that the Board found that Penn Miller's reason was not only pretextual but absolutely false.

---

[4] She also emphasizes that when she called Sproul, he repeatedly told her he was glad she called.  We find that this does not undermine Penn Millers' reasoning because Sproul was not the decisionmaker, nor is there any evidence that he was even aware that she had been specifically instructed not to call him.

The parties do not dispute that the arbiter's dispute has no preclusive effect on this Court.  Rue v. K-Mart Corp, 713 A.2d 82, 86 (Pa. 1998).  Rather, the issue before us is the proper weight to afford this decision.  Helfrich v. Lehigh Valley Hospital, No.CIV.A.03cv5793, 2005 WL 1715689, at * 20 (E.D. Pa. July 21, 2005)(acknowledging that a decision of the Unemployment Compensation Board can be admissible and probative, but finding it did not create a genuine issue of material fact of discrimination in a Title VII case because of the "divergent factual, legal, and policy considerations addressed by the Referee and this Court.").

We find that the Referee's decision would not allow a reasonable jury to discredit Penn Milllers' legitimate non-discriminatory reasons.  Primarily, the Referee was faced with an entirely different determination than is presently before the Court.  The issue before the Referee was not the credibility of Penn Millers' reasoning for firing Williamson, but whether her actions constituted willful misconduct under the Unemployment Compensation Law, 43 PA. CONS. STAT. ANN. § 802(e).   See Helfrich, 2005 WL 1715689, at *20 ("Pennsylvania Courts recognize that the existence of wilful misconduct is a different legal issue than the propriety of the employer's decision to discharge."); see also Frumento v. Unemployment Compensation Board, 351 A.2d 631, 634 (Pa. 1976) (the issue before the Unemployment Compensation Referee is "not whether the employer had the right to discharge for the questioned conduct, of the employee, but rather whether the State is justified in reinforcing that decision by denying benefits under this Act for the complained of conduct.").

Therefore, contrary to Williamson's assertion, the Referee made no determination as to the propriety or veracity of Penn Millers' decision.  He simply was faced with the question of whether Williamson's conduct was willful under the meaning of the Unemployment Compensation Law, 43 PA. STAT. § 802(e).

Furthermore, the purpose of unemployment compensation is to alleviate the economic insecurity resulting from unemployment, not to provide a forum for former employees to litigate disputes with their previous employer.  Frumento, 351 A.2d at 634 n.4.  In order to quickly provide relief to discharged employees, unemployment compensation hearings are informal and the amount of money at stake for the employer is minimal.  Rue, 713 A.2d at 85-86 (explaining that unemployment compensation hearings do not follow rules of evidence and the sole financial repercussion for the employer is a small increase in its future contribution to the Unemployment Compensation Fund).  Therefore, the hearings do not consist of a thorough review of the facts between parties with an economic incentive to develop the record.

Most important, the Referee reviewing Williamson's case had none of the facts presently before this Court.  (Staples Aff. ¶ 8, Pl. Ex. N).  Penn Millers did not appeal the decision or present any evidence at all.  (Id.).  Thus, the Referee determined solely that Penn Millers presented no evidence on whether or not Williamson's conduct was willful, and made no finding either on the evidence or the issue before this Court.  Alexander v. Gardner-Denver Co., 415 U.S. 36, 60 (1974) (providing that the weight to be afforded an arbitral

decision depends on record before the arbitrator).  Therefore, the Board's decision to grant

unemployment benefits does not undermine the credibility of Penn Miller's legitimate

nondiscriminatory reasons for terminating Williamson's employment. [5]

### ii.    Discriminatory Reason the Determinative Cause

A plaintiff can also survive summary judgment by establishing evidence that "allows

the fact finder to infer that discrimination was more likely than not a motivating or

determinative cause of the adverse employment action."  Fuentes v. Perskie, 32 F.3d 759,

764 (3d Cir. 1994).  "For example, the plaintiff may show that the employer has previously

discriminated against [the plaintiff], that the employer has previously discriminated against

other persons within the plaintiff's protected class, or that the employer has treated more

favorably similarly situated persons not within the protected class."  Simpson v. Kay

Jewelers, 142 F.3d 639, 645 (3d Cir. 1998) (citing Fuentes, 32 F.3d at 765).  Williamson

argues that the discrepancy in Lettieri's treatment and her treatment demonstrates that

discrimination was more likely than not a motivating or determinative cause of her

termination.  She notes that Lettieri was significantly younger than her, and whereas Burke

refused to give her a new title, he gave Lettieri a new title after he fired Williamson.

Furthermore, Lettieri's new position was in a higher salary grade, and Lettieri's raises in her

---

[5] Furthermore, Penn Millers' failure to oppose Williamson's claim for unemployment compensation in no way places its legitimate nondiscriminatory reason in doubt.  As noted supra, it had very little financial incentive to oppose the application and the legitimacy of its decision to terminate Williamson was not at issue.

new position were ten, eight, and six percent, and Williamson never received a raise over five percent.

We find that Lettieri's treatment in no way evinces that age discrimination factored in the decision to terminate Williamson because Lettieri was not similarly situated and treated favorably. Lettieri certainly was both younger and placed in a new position with a higher salary grade. Lettieri, however, not only assumed Williamson's duties, but continued to perform her own duties in public relations. Furthermore, because Williamson received a salary far in excess of the maximum for her salary grade, Lettieri earned less than Williamson. When Williamson was terminated, she earned $43,290. Lettieri received a ten percent bonus after assuming Williamson's duties, but still earned only $37,358.10 after the raise. After two more raises, Lettieri earned only $ 42,773,12. Thus, Lettieri was neither similarly situated nor treated more favorably because she earned less money to do more work.

Moreover, the company's refusal to grant Williamson a title similar to Lettieri's is not evidence of discrimination. Williamson has neither argued nor produced any evidence that she was qualified to perform Lettieri's public relations work or that she offered to take on additional responsibilities in addition to assisting Burke. In fact, she never asked for a title and never even applied for another job within the company. (Pl. Dep. 69,76). She simply asked how she could be in position to earn more money, was directed to take further training, and never took advantage of these opportunities.

19

Finally, we find substantial evidence for the defendants' assertion that no discrimination occurred and they fired Williamson for insubordination. "[A]n employer would be entitled to judgment as a matter of law . . . if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant ... evidence that no discrimination had occurred." Goodman v. Pennsylvania Turnpike Commission, 293 F.3d 655, 673 (3d Cir. 2002). Burke warned her multiple times that she would suffer consequences if she took personnel matters to Sproul. The Vice President, Mark DeCesaris, specifically warned her that she could be cited for insubordination. Williamson then promised Burke that she would not ask for a meeting with Sproul or Rose. After she spoke with Sproul, she called her friend and told her she believed she would soon be fired. Two work days later, Penn Millers terminated her employment.

Therefore, we find that no reasonable jury could disbelieve that the defendants terminated Williamson for her insubordination, nor could a reasonable jury find that discrimination was more likely than not a motivating or determinative cause of her termination. Accordingly, we will enter summary judgment on behalf of the defendants. An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| PATRICIA WILLIAMSON, | : | No. 3:04cv1142 |
| Plaintiff | : | |
| | : | (Judge Munley) |
| v. | : | |
| | : | |
| PENN MILLERS INSURANCE | : | |
| COMPANY, JACK L. BURKE, and | : | |
| HARVEY SPROUL, | : | |
| Defendants | : | |

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## ORDER

    **AND NOW**, to wit, this 14th day of December 2005, Defendants' Joint Motion for

Summary Judgment (Doc. 13) is hereby **GRANTED**.  The Clerk of Court is hereby directed

to enter judgment on behalf of the defendants.


                  **BY THE COURT:**

                  **s/ James M. Munley**
                  **JUDGE JAMES M. MUNLEY**
                  **United States District Court**